UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.

KENT GASAWAY and
RHONDA GASAWAY,

     Plaintiffs,

v.

THE FOREST HOMEOWNERS ASSOCIATION, INC.,
MATTHEW MILLER, JOHN KELLY FORST,
and JONATHAN WHITNEY, individually.

     Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Kent Gasaway and Rhonda Gasaway, by and through their undersigned counsel, sue Defendants, The Forest Homeowners Association, Inc., Matthew Miller, John Kelly Forst and Jonathan Whitney, and allege as follows:

## INTRODUCTION

1. This is an action for disability discrimination in housing brought under the Fair Housing Act, as amended, 42 U.S.C. § 3601 et seq. (the "FHA"), by Kent Gasaway, a homeowner living with Parkinson's disease, and his wife, Rhonda Gasaway, against their homeowners' association and the individuals who direct its affairs.

2. Plaintiffs' home at 10862 Leafwing Drive, Sarasota, Florida, is one of only three homes in The Forest at Hi Hat Ranch, a gated community of approximately

**Page 1 of 32**

thirty-five single-family homes, that backs directly onto a lake inhabited by multiple large alligators, which regularly haul out onto the bank of Plaintiffs' yard.

3.     Because Parkinson's disease substantially impairs Mr. Gasaway's mobility, balance, and reaction time, including episodes of "freezing" in which he cannot move his legs at all, Mr. Gasaway cannot safely use his own backyard without a protective barrier between himself and the alligators. For him, a fence is not an aesthetic amenity; it is a life-safety necessity.

4.     On November 19, 2021, Mr. Gasaway submitted a written request to the Association's Board of Directors to install a fence, expressly disclosing his Parkinson's disease, describing the alligator hazard, and explaining that the fence was necessary for his safety. Rather than promptly granting that reasonable request, Defendants subjected Mr. Gasaway to approximately six months of delay, an outright denial that ignored his disability, shifting and escalating procedural demands, a required third-party design consultant, and a letter from the Association's counsel denying that any accommodation request had even been made and questioning whether any accommodation was "necessary."

5.     On May 16, 2022, the chair of the Association's Architectural Review Committee ("ARC") advised Mr. Gasaway verbally, and confirmed in writing by email that same morning, that "your fence and landscaping has been approved." In reasonable reliance on that approval, Plaintiffs spent approximately $150,000

installing a high-quality wrought-iron fence and the extensive landscaping the ARC had demanded.

6.      For nearly four years thereafter, the Association raised no objection to the fence's existence. Then, on March 11, 2026, the Association and Board members who are individually named defendants reversed course: it served Plaintiffs with a statutory presuit mediation demand asserting, falsely and contrary to its own ARC chair's written approval, that the fence was never approved and must be removed. The Association has since escalated with a cease-and-desist "Notice of Violation" and threats of litigation, all while, on information and belief, tolerating an unapproved fence installed by a non-disabled homeowner in the same community with no comparable enforcement.

7.      The continuing reality of the danger is not in dispute: on or about June 18, 2026, while planting shrubs outside the fence at Plaintiffs' direction in an effort to address the Association's stated concerns, Plaintiffs' landscaper texted that he had to stop work because an approximately eleven-foot alligator was stalking him and he did not feel safe.

8.      Plaintiffs bring this action to secure their federally protected right to a reasonable accommodation and modification, to enjoin Defendants' discriminatory campaign to strip that accommodation away, and to recover compensatory and punitive damages, attorneys' fees, and costs.

## PARTIES

9.      Plaintiff Kent Gasaway is a natural person and citizen of the State of Florida who owns and resides at 10862 Leafwing Drive, Sarasota, Florida 34241 (the "Home"), within The Forest at Hi Hat Ranch (the "Community"). Mr. Gasaway was diagnosed with Parkinson's disease in or about 2014.

10.      Parkinson's disease is a progressive neurodegenerative disorder. Mr. Gasaway's Parkinson's disease causes, among other symptoms, impaired gait and balance, slowed reaction time, and episodes of "freezing" during which he temporarily cannot move his legs. Mr. Gasaway's condition has progressed during the pendency of this dispute and has required repeated hospitalizations in recent months, as well as regular infusion therapy.

11.      Mr. Gasaway's Parkinson's disease is a physical impairment that substantially limits one or more major life activities, including walking, standing, balancing, and reacting to danger. Mr. Gasaway is accordingly a person with a "handicap" (disability) within the meaning of 42 U.S.C. § 3602(h), and an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i).

12.      Plaintiff Rhonda Gasaway is a natural person and citizen of the State of Florida, is Kent Gasaway's wife, and co-owns and resides at the Home. Mrs. Gasaway is a person associated with a person with a disability within the meaning of 42 U.S.C. § 3604(f)(2)(C) and is an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i) who has been and will be injured by the discriminatory conduct alleged herein.

13.     Defendant, The Forest Homeowners Association, Inc. (the "Association" or "HOA") is a Florida not-for-profit corporation with its principal place of business in Sarasota County, Florida. The Association is the homeowners' association governing the Community pursuant to the Declaration of Covenants, Conditions, Easements, and Restrictions for Forest at Hi Hat Ranch (the "Declaration") and related governing documents. The Association, acting directly and through its Board of Directors (the "Board"), its Architectural Review Committee (also referred to in the governing documents as the Architectural Committee) (the "ARC"), its retained community-management companies, and its counsel, controls the approval of modifications to homes in the Community, enforces the Declaration and architectural standards, and provides services and facilities in connection with dwellings in the Community. The Association is subject to the FHA in the exercise of those functions.

14.     Defendant Matthew Miller is a natural person who, on information and belief, is a citizen of the State of Florida and at all times relevant hereto has served as a member and/or President of the Association's Board. On information and belief, Mr. Miller personally participated in, directed, authorized, and/or ratified the discriminatory acts alleged herein, including the March 11, 2026, demand that Plaintiffs remove the fence. Mr. Miller is sued in his individual capacity.

15.     On information and belief, current board members John Kelly Forst and Jonathan Whitney voted for, directed, authorized, or ratified the March 2026 removal

demand and subsequent enforcement actions, each sued in his individual capacity because at all relevant times served as a member of the Association's Board of Directors and personally participated in the discriminatory conduct alleged herein.

16.     At all times relevant hereto, the Board members, ARC members, property managers identified herein acted as agents of the Association and within the scope of their actual or apparent authority, and the Association is vicariously liable for their acts and omissions under traditional principles of agency law.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction over Plaintiffs' FHA claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(4) and 42 U.S.C. § 3613(a)(1)(A), which authorizes an aggrieved person to commence a civil action in an appropriate United States district court without first exhausting any administrative remedy.

18.     This Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, Rule 65 of the Federal Rules of Civil Procedure, and 42 U.S.C. § 3613(c).

19.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because Defendants reside in this District and a substantial part of the events and omissions giving rise to the claims occurred in this District, and in the Tampa Division under Local Rule 1.04(a) because the claims arose in Sarasota County, Florida.

20.    All conditions precedent to this action, if any, have been performed, have occurred, or have been waived or excused. No administrative exhaustion is required under 42 U.S.C. § 3613. Plaintiffs' FHA discrimination claims are not "disputes" subject to the presuit mediation requirement of § 720.311, Florida Statutes; in any event, Plaintiffs have timely responded to and participated in good faith in the presuit mediation process initiated by the Association.

## STATUTORY FRAMEWORK

21.    Congress enacted the Fair Housing Act to provide for fair housing throughout the United States, 42 U.S.C. § 3601, and in 1988 amended the Act to extend its protections to persons with disabilities. The FHA is to be given a "generous construction" in furtherance of its broad remedial purpose. *See City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995); *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 212 (1972).

22.    Under 42 U.S.C. § 3604(f)(2), it is unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of" that person, a person residing in the dwelling, or any person associated with that person. See also 24 C.F.R. § 100.65.

23.    Under 42 U.S.C. § 3604(f)(3)(A), discrimination includes "a refusal to permit, at the expense of the handicapped person, reasonable modifications of existing premises occupied or to be occupied by such person if such modifications may be

**Page 7 of 32**

necessary to afford such person full enjoyment of the premises." See also 24 C.F.R. § 100.203.

24.     Under 42 U.S.C. § 3604(f)(3)(B), discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." See also 24 C.F.R. § 100.204.

25.     Under the law of this Circuit, a housing provider's undue delay, imposition of unnecessary conditions, and demands for information beyond what is needed to evaluate an accommodation request may constitute a constructive denial of, and thus, an actionable failure to make, a reasonable accommodation. *See Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285–87 (11th Cir. 2014).

26.     Under 42 U.S.C. § 3617, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by section . . . 3604" of the FHA. See also 24 C.F.R. § 100.400; *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991).

27.     Homeowners' associations and their architectural review bodies are subject to §§ 3604 and 3617 when they condition, delay, deny, or revoke approvals for disability-related modifications, when they enforce covenants and rules, and when they provide services and facilities in connection with dwellings in their communities.

28.    An aggrieved person who prevails in a civil action under the FHA may recover actual damages (including damages for emotional distress, humiliation, and loss of housing opportunity), punitive damages, injunctive and other equitable relief, and reasonable attorneys' fees and costs. 42 U.S.C. § 3613(c).

## FACTUAL ALLEGATIONS

### A.    The Gasaways, the Home, and the Alligator Hazard

29.    Mr. Gasaway was diagnosed with Parkinson's disease in or about 2014.

30.    In substantial part because Mr. Gasaway's disease made the many stairs of the couple's longtime Kansas home increasingly difficult and dangerous for him to navigate, Plaintiffs purchased the single-story Home on April 30, 2021, as their primary retirement residence. Because of a leaseback to the sellers, Plaintiffs could not occupy the Home until late 2021.

31.    The Home sits on a lot more than three acres and is one of only three homes in the Community that back directly onto a lake. The lake is inhabited by several large alligators, which routinely lie on the bank of Plaintiffs' yard.

32.    Shortly after acquiring the Home, Plaintiffs personally witnessed, and captured on video, an alligator's violent attack on a crane in their yard.

33.    Alligators can move at a startling speed over short distances. For a person whose gait, balance, and reaction time are impaired by Parkinson's disease, and who is subject to episodes of freezing in place, an unfenced yard abutting an alligator-inhabited lake presents a genuine risk of death or serious bodily injury.

34. Without a protective fence, Mr. Gasaway could not safely use and enjoy his own backyard, whether to retrieve a pet, play with his grandchildren, garden, or simply walk his property, in the manner available to residents without his disability.

**B. The November 2021 Accommodation Request**

35. On November 19, 2021, Mr. Gasaway submitted a written request through the Community's TownSq management portal, addressed to the Board seeking approval to install a black 4.5-foot wrought-iron fence in the side and back yard of the Home. A copy of the November 19, 2021, request attached as **Exhibit 1.**

36. In that request, Mr. Gasaway expressly disclosed that he has Parkinson's disease; explained that he is "prone to freezing of my legs where I cannot move"; described the daily presence of alligators on the bank of his yard and the videotaped alligator attack he had witnessed; and stated that if he "were ever to encounter an alligator near the lake . . . there is a strong chance I could not run," so that the fence was "truly . . . a real safety issue" and was needed to "provide complete safety to our pets, grandkids, visitors, and me!"

37. The November 19, 2021, request communicated everything the Association needed to understand that Mr. Gasaway was requesting a disability-related exception, adjustment, or approval: a reasonable accommodation in the Association's rules, policies, practices, and services, and permission to make a reasonable modification at Plaintiffs' own expense, in each case necessary to afford

him an equal opportunity to use and enjoy his dwelling. No "magic words" are required to trigger a housing provider's obligations under 42 U.S.C. § 3604(f)(3).

38.    On November 19, 2021, then-Board President, William Lonchas responded to Mr. Gasaway through the portal, directing the request into the Association's architectural-review process and assigning it to then-property manager Patrick Goeser of Associa Gulf Coast. (Ex. 1.)

39.    On November 30, 2021, at the Association's direction, Mr. Gasaway submitted a complete twelve-page "The Forest Request for Modification" application package for the fence, including contractor drawings, the fence location on Plaintiffs' 2021 survey, and photographs of the proposed fence.

## C.    Six Months of Delay, Denial, and Escalating Demands

40.    On December 2, 2021, Mr. Goeser advised Mr. Gasaway in writing that his application was "[a]ll set now, going to ARC for review."

41.    On information and belief, Mr. Goeser's representation was false: the application was never delivered to the ARC at that time. When new property manager Frank DeMatteis took over in early January 2022, he reported that he could not "locate any previous submissions."

42.    Throughout December 2021, Mr. Gasaway repeatedly followed up by telephone, email, and portal message, including a December 7, 2021, email ("Any word on my fence?") and a December 11, 2021, message to President Lonchas and the Board, and received no substantive response.

43.     On January 4, 2022, Mr. Gasaway wrote to Mr. DeMatteis that nearly six weeks had passed since his complete submission, that he had "heard nothing," and that his fence contractor's schedule was slipping as a result.

44.     On January 13, 2022, about eight weeks after Mr. Gasaway's written disability disclosure, ARC chair Dominika Miller emailed Mr. Gasaway that "[t]he ARC has declined your project," citing a purportedly missing landscaping plan, claimed covenant and setback violations, a prohibition on "perimeter fencing," and subjective style and color concerns.

45.     The January 13, 2022, denial did not mention, analyze, or even acknowledge Mr. Gasaway's disability or his request for disability-related accommodation. It treated a life-safety accommodation request as an ordinary aesthetic application, and denied it.

46.     At no time in November 2021, December 2021, or January 2022 did the Association engage in any interactive process with Mr. Gasaway concerning his disability-related needs, request any information about his disability, or evaluate his request under the FHA.

47.     Following a January 17, 2022, site visit, the ARC issued a list of additional and shifting requirements, including a detailed landscaping plan specifying the size of every plant; vegetation guaranteed to reach "full maturity within 3 years"; complete concealment of the fence from the road; relocation of the lakeside fence run

closer to the house; landscaping on the fire-pond side; and stylistic "commonality" requirements.

48. On February 16, 2022, the ARC demanded still further items, including a plant-list exhibit, a survey marking easements, marked gate placements with landscaping to hide the gates, gutter placement, and the locations of existing trees.

49. By mid-February 2022, the cumulative delay, obstruction, and moving targets had taken a serious toll on Mr. Gasaway's health. On February 17, 2022, exhausted and, in his words, "simply worn out," Mr. Gasaway wrote the ARC that "[t]he stress on me related to this failed approval attempt is not good for my health" and attempted to withdraw his request.

50. In the same period, Mr. Gasaway recorded that Board President Matthew Miller had personally told him that "the board knew that they had to approve the fence because of my specific disability situation." The Board thus understood both the disability and its legal obligation yet withheld approval anyway.

51. On February 23, 2022, still desperate to protect himself without litigation, Mr. Gasaway submitted a substantially scaled-back proposal, writing that he and his wife "really don't want to move . . . but we do [w]ant to feel safe." The ARC did not approve that proposal either; instead, Mr. Gasaway was told the ARC would require review by an independent third-party consultant.

**D.    The March 2022 Formal Demand and the Association's Denial That Any Accommodation Was Requested**

52.     On March 23, 2022, attorney Kristi K. Gasaway, Mr. Gasaway's sister, sent the Board a formal letter detailing the history of the request, invoking 42 U.S.C. §§ 3604(f)(2) and (f)(3)(B) and 24 C.F.R. §§ 100.202 and 100.204, identifying comparator fences elsewhere in the Community (including at 10130 Ruffled Fern, 9060 Swaying Branch, and 9071 Swaying Branch), noting the ARC's express waiver authority under § 5.19 of the Architectural Guidelines, and demanding that the fence be approved, in the alternative, as a reasonable accommodation and modification for Mr. Gasaway's disability.

53.     On March 25, 2022, the Association, through its counsel Scott K. Petersen, responded by: (a) denying that Plaintiffs had ever "made a request for a reasonable accommodation"; (b) questioning whether any accommodation was "necessary," "even if one were to concede that such is necessary"; (c) asserting that the application was incomplete; and (d) faulting Plaintiffs for not paying a $250 processing fee that, on information and belief, no one had told Mr. Gasaway was due. A copy of the March 25, 2022, letter is attached as **Exhibit 2**.

54.     The Association's March 25, 2022, position, that a homeowner who disclosed his Parkinson's disease in writing and explained that he could not flee an alligator had somehow made no accommodation request, was objectively unreasonable and evidenced the Association's refusal to engage with its obligations under the FHA.

55.    Mr. Gasaway paid the $250 fee and as required by the ARC, worked with the ARC-referred third-party design consultant, Mike Kramer of BSB Design. On or about April 22–27, 2022, Mr. Gasaway submitted the final revised application package (his original application dated back to November 30, 2021) through Mr. Kramer, noting that "[a]fter 5+ months of waiting and significant stress we expect approval within one week."

**E.    The May 16, 2022, Approval and Plaintiffs' $150,000 Reliance**

56.    On May 16, 2022, ARC chair Dominika Miller advised Mr. Gasaway verbally that the fence was approved in its originally proposed location, with agreed supplemental lakeside plantings. Mr. Gasaway memorialized the approval in a contemporaneous handwritten note.

57.    That same day, at 10:03 a.m., Ms. Miller confirmed the approval in writing, emailing Mr. and Mrs. Gasaway: "I just wanted to let you know that your fence and landscaping has been approved. Have a wonderful day and an incredible trip! Congratulations!" A copy of Mr. Gasaway memorialized approval in a contemporaneous handwritten note the May 16, 2022, approval email attached as **Exhibit 3.**

58.    On information and belief, Dominika Miller, the ARC chair who communicated the Association's approval verbally and in writing, is the wife of Defendant Matthew Miller, the Association's President, who months earlier had acknowledged that the Board "knew that they had to approve the fence because of"

Mr. Gasaway's disability and who, in 2026, signed the Association's demand asserting that the fence was never approved.

59.     In reasonable and foreseeable reliance on the Association's approval, Plaintiffs proceeded with construction and, during the summer of 2022, completed installation of the wrought-iron fence and the extensive landscaping the ARC had required, at a total cost around $150,000.

60.     The Association, its Board, its ARC, and its management companies knew of and observed the months-long, highly visible construction of the fence and landscaping in the summer of 2022 and raised no objection that the fence lacked approval.

F.      Four Years of Acquiescence

61.     In late September 2022, Hurricane Ian struck the Sarasota area, and it and subsequent storms damaged or destroyed portions of the landscaping installed outside the fence.

62.     On February 6, 2023, the Association's then-management company, Pinnacle Community Association Management, sent Plaintiffs a violation notice addressed solely to the condition of the landscaping around the fence. The notice did not assert that the fence itself was unapproved or improper.

63.     From February 2023 through March 2026, a period during which the Board's membership changed and the Association's management changed at least

twice. The Association sent Plaintiffs no further notice, demand, or objection of any kind concerning the fence.

### G.    The 2026 Campaign to Strip Away the Accommodation

64.    On March 11, 2026, the Association, under the signature block of its President, Defendant Matthew Miller, served Plaintiffs with a "Statutory Offer to Participate in Presuit Mediation" pursuant to § 720.311, Florida Statutes, asserting that Plaintiffs "failed to obtain final Architectural Committee approval before installing their fence" and that the fence "is visible from the street and from adjoining lots," and demanding relief that would require removal of the fence.

65.    The premise of March 11, 2026, demand, that Plaintiffs "failed to obtain final Architectural Committee approval before installing their fence," is false. The Association's own ARC chair approved the fence and landscaping verbally and in writing on May 16, 2022, before installation. Defendants either knew their assertion was false when they made it or made it with reckless disregard for its truth, given that the approving ARC chair is, on information and belief, the wife of the very Board President under whose name the demand issued.

66.    The March 11, 2026, demand seeks to revoke, rescind, and eliminate the safety accommodation and modification that Mr. Gasaway requested because of his disability, that the Association approved verbally and in writing, and on which Plaintiffs spent approximately $150,000. It constitutes a present and continuing refusal to permit and maintain a reasonable accommodation and modification.

67. Plaintiffs timely responded to the demand, agreed to mediators from the Association's list, and, because of Mr. Gasaway's medical needs, proposed half-day afternoon sessions. Mediation was eventually scheduled for July 7, 2026.

68. In late June 2026, Mr. Gasaway's and Kristi Gasaway's mother entered hospice care at the end of her life, and Plaintiffs requested a continuance of the mediation. The Association, through counsel, permitted only to reschedule for Thursday, July 23, 2026, from 9:00 a.m. to 1:00 p.m., a morning slot during which Mr. Gasaway is scheduled to receive an infusion, citing Board members' availability, and without acknowledging, or adjustment for, Mr. Gasaway's disability.

69. In June 2026, in a good-faith effort to resolve the Association's stated "visibility" concern before mediation, Plaintiffs engaged a landscaper to plant screening shrubs along the outside of the fence.

70. On June 18, 2026, the Association, through its counsel, responded with a "Notice of Violation" demanding that Plaintiffs "cease and desist from any plantings immediately," asserting again that the fence "has not been approved," and threatening that the Association would "proceed accordingly" if Plaintiffs did not respond to the mediation demand by close of business a day later. A copy of the March 11, 2026, demand and June 18, 2026, violation attached as **Exhibit 4.**

71. The Association thus simultaneously faults Plaintiffs' fence for being visible and forbids Plaintiffs from planting the landscaping that would screen it. That

incoherent position is explicable only as pretext for forcing removal of the disability accommodation itself.

72.    Also on June 18, 2026, while working outside the fence, Plaintiffs' landscaper texted Mrs. Gasaway that he had to stop work because an approximately eleven-foot alligator was stalking him and he did not feel safe continuing.  The events of June 18, 2026, independently corroborate that the danger Mr. Gasaway described in November 2021 is real, present, and continuing.

### H.    The Association's Disparate Treatment of Non-Disabled Homeowners

73.    On information and belief, another homeowner in the Community, who is not disabled and did not request any disability accommodation, submitted a fence application to which the Association never responded; installed his fence anyway, without any written approval; was later asked by the Association merely to add some landscaping; did so; and has never been subjected to any violation notice, removal demand, presuit mediation demand, or threat of litigation concerning his fence.

74.    On information and belief, numerous other fences of similar wrought-iron or metal design exist in the Community, including at 10130 Ruffled Fern, 9060 Swaying Branch, and 9071 Swaying Branch, several of which are visible from the street, and none of which, on information and belief, has been the subject of a removal demand. Indeed, the Community itself is enclosed by a black perimeter fence that the Association repainted in 2022 for the protection of all residents.

75.    The Association has singled out for its harshest enforcement the one fence in the Community that exists as a disability accommodation, belonging to the one homeowner who invoked his rights under the FHA.

### I.    Harm to Plaintiffs

76.    As a direct and proximate result of Defendants' conduct, Mr. Gasaway was deprived for many months of the safe use and enjoyment of his backyard and dwelling; suffered and continues to suffer severe emotional distress, anxiety, humiliation, embarrassment, frustration, loss of sleep, and aggravation of the symptoms and progression of his Parkinson's disease; and has been forced to divert his limited energy and declining health from medical treatment to defending his right to remain safely in his own home.

77.    As a direct and proximate result of Defendants' conduct, Mrs. Gasaway has suffered emotional distress, anxiety, humiliation, and loss of the use and enjoyment of the Home, and Plaintiffs have incurred and continue to incur out-of-pocket losses, including costs attributable to the discriminatory delay, the $250 fee and consultant-related costs imposed as conditions of approval, expenditures made in reliance on the Association's approval that Defendants now seek to render worthless, and attorneys' fees and costs.

78.    Defendants' threatened enforcement—removal of the fence, would recreate the precise life-safety hazard the accommodation was designed to eliminate,

exposing Mr. Gasaway to a risk of death or serious bodily injury for which there is no adequate remedy at law.

## DEFENDANTS' DISCRIMINATORY CONDUCT

79.    The conduct alleged above constitutes, among other things: (a) a constructive and actual denial, through approximately six months of delay, obstruction, an outright denial, shifting demands, and unnecessary conditions, of a reasonable accommodation and modification necessary for Mr. Gasaway to use and enjoy his dwelling; (b) a present and continuing refusal, beginning no later than March 11, 2026, to permit Mr. Gasaway to retain and maintain that accommodation and modification; (c) discrimination in the terms, conditions, and privileges of Plaintiffs' housing and in the provision of services and facilities in connection with their dwelling, including through selective enforcement; and (d) coercion, intimidation, threats, and interference directed at Plaintiffs in the exercise and enjoyment of their fair-housing rights.

80.    Defendants' 2026 removal campaign is part of, and in furtherance of, a continuing discriminatory practice that began with the Association's response to Mr. Gasaway's November 19, 2021, request and continues through the present, including the March 11, 2026, removal demand, the June 18, 2026, cease-and-desist notice, and Defendants' ongoing threats of enforcement litigation. Plaintiffs' claims are timely under 42 U.S.C. § 3613(a)(1)(A) because they are brought within two years of the

termination of that continuing practice and within two years of each of the discrete discriminatory acts of 2026.

81.     Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiffs' federally protected rights. Among other things, Defendants knew of Mr. Gasaway's disability from November 19, 2021; President Miller acknowledged that the Board "knew that they had to approve the fence because of" Mr. Gasaway's disability; the Association's counsel was placed on express written notice of the FHA's requirements no later than March 23, 2022; and Defendants nonetheless denied that any accommodation had been requested, delayed and obstructed the request, and now seek to eliminate the accommodation altogether, on the demonstrably false premise that it was never approved and notwithstanding the May 16, 2022, written approval issued by the Association's own ARC chair, while treating non-disabled homeowners more favorably.

## COUNT I
### Refusal to Make a Reasonable Accommodation, 42 U.S.C. § 3604(f)(3)(B)
*(Against All Defendants)*

82.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 above as if fully set forth herein.

83.     Mr. Gasaway is a person with a handicap within the meaning of 42 U.S.C. § 3602(h): his Parkinson's disease is a physical impairment that substantially limits major life activities, including walking, standing, balancing, and reacting to danger.

84.    Defendants knew of Mr. Gasaway's disability no later than November 19, 2021, when he disclosed it in writing, and at all times afterward.

85.    Mr. Gasaway requested an accommodation in the Association's rules, policies, practices, and services—approval of a protective fence and any exception or waiver of architectural restrictions and conditions necessary to permit it, by his November 19, 2021, written request, his November 30, 2021, application, his repeated follow-ups, his February 2022 scaled-back proposal, and the March 23, 2022, formal demand letter sent on his behalf.

86.    The requested accommodation was necessary to afford Mr. Gasaway an equal opportunity to use and enjoy his dwelling: without a fence, his disability prevented him from safely using his yard and property adjoining an alligator-inhabited lake, an opportunity available to residents without his disability. There is an obvious nexus between his disability (impaired mobility, balance, reaction time, and freezing episodes) and the protection the fence provides.

87.    The requested accommodation was reasonable: it was to be installed entirely at Plaintiffs' expense; it was consistent in design and materials with several existing fences in the Community and with the Community's own black perimeter fence; the Association possessed express waiver authority under its own Architectural Guidelines; and the accommodation imposed no fundamental alteration of the Association's scheme and no undue financial or administrative burden.

88.    Defendants refused to make the requested accommodation, and constructively, by, among other things: failing to respond for weeks at a time; falsely representing the application had been forwarded to the ARC; denying the application outright on January 13, 2022 without considering the disability; imposing months of shifting, escalating, and unnecessary conditions and information demands; requiring engagement of a third-party consultant; denying on March 25, 2022 that any accommodation request had been made and questioning its necessity; and failing at all times to engage in any good-faith interactive process. Under *Bhogaita* , this undue delay and obstruction constituted a denial of the accommodation, which was not cured until May 16, 2022, approval more than five months after the initial request.

89.    Defendants have also refused, and are presently refusing, to make and to honor the reasonable accommodation by demanding, beginning March 11, 2026, and continuing through the present, that the fence be removed, by forbidding the screening plantings that would preserve it, and by threatening enforcement litigation to compel its removal. A demand that a disabled homeowner dismantle an accommodation already in place is a refusal to make (and to continue) a reasonable accommodation within the meaning of § 3604(f)(3)(B).

90.    When Defendants contend the fence was never approved, then Plaintiffs' outstanding request for approval remains pending and denied, and Defendants' refusal to grant it, communicated by their March 11, 2026, and June 18, 2026, demands, is itself a present refusal of a reasonable accommodation.

91.     As a direct and proximate result of Defendants' refusal, Plaintiffs suffered and continue to suffer the injuries and damages alleged herein, including deprivation of the safe use and enjoyment of their dwelling, emotional distress, humiliation, aggravation of Mr. Gasaway's condition, and economic loss.

92.     Defendant Matthew Miller and the individual Defendants personally participated in, directed, authorized, and/or ratified the refusal, and each is individually liable therefore; the Association is directly liable and vicariously liable for the acts of its Board, ARC, managers, and agents.

93.     Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiffs' federally protected rights, entitling Plaintiffs to punitive damages under 42 U.S.C. § 3613(c)(1).

## COUNT II
### Refusal to Permit a Reasonable Modification, 42 U.S.C. § 3604(f)(3)(A)
*(Against All Defendants)*

94.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 above as if fully set forth herein.

95.     The fence is a physical modification of the premises occupied by Mr. Gasaway, proposed and installed entirely at Plaintiffs' expense.

96.     The modification was and is necessary to afford Mr. Gasaway full enjoyment of the premises, for the reasons alleged above: without it, his disability denies him safe use of his yard and the exterior of his own home.

97.    The modification was and is reasonable in design, scale, materials, and placement, as shown by, among other things, the Association's own eventual approval of it, the existence of comparable fences throughout the Community, and the Community's own perimeter fence.

98.    Defendants refused to permit the modification, and constructively, through the six months of denial, delay, obstruction, and escalating conditions alleged above; and Defendants presently refuse to permit the modification's continued existence through their March 11, 2026, removal demand, their June 18, 2026, cease-and-desist notice, and their continuing threats of enforcement litigation.

99.    As a direct and proximate result, Plaintiffs suffered and continue to suffer the injuries and damages alleged herein. Defendant Matthew Miller and the individual Defendants personally participated in, directed, authorized, and/or ratified this conduct; the Association is directly and vicariously liable; and Defendants' intentional, malicious, and/or recklessly indifferent conduct entitles Plaintiffs to punitive damages under 42 U.S.C. § 3613(c)(1).

## COUNT III
**Discrimination in Terms, Conditions, Privileges, Services, or Facilities,
42 U.S.C. § 3604(f)(2)**
*(Against All Defendants)*

100.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 above as if fully set forth herein.

101.    The Association's architectural-review process, covenant enforcement, violation and fining procedures, and dispute-resolution processes are terms,

conditions, and privileges of Plaintiffs' ownership and occupancy of their dwelling, and services and facilities provided in connection with that dwelling, within the meaning of 42 U.S.C. § 3604(f)(2).

102. Defendants discriminated against Plaintiffs in those terms, conditions, privileges, services, and facilities because of Mr. Gasaway's disability and because of Mrs. Gasaway's association with him, by, among other things: (a) subjecting Mr. Gasaway's application to delay, denial, procedural burdens, consultant requirements, fees, and levels of scrutiny not imposed on non-disabled applicants; (b) selectively enforcing the Declaration and architectural standards against Plaintiffs' disability-related fence while, on information and belief, tolerating an unapproved fence installed by a non-disabled homeowner with no comparable enforcement, and tolerating similar visible fences throughout the Community; (c) demanding removal of Plaintiffs' fence nearly four years after approval and installation while making no such demand of any similarly situated non-disabled homeowner; (d) forbidding Plaintiffs from installing the very landscaping that would cure the Association's stated objection; and (e) administering the presuit mediation process without regard to, and in disregard of, Mr. Gasaway's known medical needs.

103. Disability was a motivating factor in Defendants' differential treatment of Plaintiffs. The sequence and character of Defendants' conduct, including hostility triggered by a disability-based request, an admission that the Board "knew that they had to approve the fence" because of the disability, denial that any accommodation

was requested, and uniquely aggressive enforcement against the sole accommodation-based fence in the Community, supports the inference of discriminatory intent; in the alternative, Defendants' facially neutral enforcement practices have been applied to Plaintiffs in a discriminatory manner.

104. As a direct and proximate result, Plaintiffs suffered and continue to suffer the injuries and damages alleged herein. Defendant Matthew Miller and the individual Defendants personally participated in, directed, authorized, and/or ratified this conduct; the Association is directly and vicariously liable; and Defendants' intentional, malicious, and/or recklessly indifferent conduct entitles Plaintiffs to punitive damages under 42 U.S.C. § 3613(c)(1).

## COUNT IV
### Coercion, Intimidation, Threats, and Interference, 42 U.S.C. § 3617
*(Against All Defendants)*

105. Plaintiffs reallege and incorporate by reference paragraphs 1 through 81 above as if fully set forth herein.

106. Plaintiffs exercised and enjoyed rights granted and protected by 42 U.S.C. § 3604, including the right to request, obtain, and maintain a reasonable accommodation and modification and the right to the non-discriminatory terms, conditions, privileges, services, and facilities of their housing.

107. Defendants coerced, intimidated, threatened, and interfered with Plaintiffs in the exercise and enjoyment of those rights, and on account of Plaintiffs having exercised them, by, among other things: (a) demanding on March 11, 2026 that

Plaintiffs remove the accommodation, on pain of litigation; (b) issuing the June 18, 2026 cease-and-desist notice forbidding remedial plantings and threatening that the Association would "proceed accordingly" within one business day; (c) threatening enforcement litigation designed to force a disabled homeowner to dismantle his safety accommodation or abandon his home; (d) refusing any meaningful adjustment of the mediation schedule for Mr. Gasaway's medical treatment or his mother's death; and (e) engaging in the pattern of delay, obstruction, and selective enforcement alleged above.

108.   Defendants' conduct would chill a reasonable person in the exercise of fair-housing rights and was undertaken with discriminatory animus toward, or reckless disregard of, Plaintiffs' protected rights.

109.   As a direct and proximate result, Plaintiffs suffered and continue to suffer the injuries and damages alleged herein. Defendant Matthew Miller and the individual Defendants personally participated in, directed, authorized, and/or ratified this conduct; the Association is directly and vicariously liable; and Defendants' intentional, malicious, and/or recklessly indifferent conduct entitles Plaintiffs to punitive damages under 42 U.S.C. § 3613(c)(1).

## DAMAGES

110.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer: (a) non-economic damages, including severe emotional distress, anxiety, humiliation, embarrassment, indignity,

inconvenience, loss of sleep, fear for personal safety, and loss of the use and enjoyment of their dwelling; (b) physical harm to Mr. Gasaway, including stress-related aggravation of the symptoms and progression of his Parkinson's disease; (c) economic damages, including out-of-pocket costs attributable to the discriminatory delay and the conditions Defendants imposed, fees and consultant costs, losses associated with the threatened destruction of approximately $150,000 in reliance expenditures, and diminution in the value and marketability of the Home while under threat of enforcement; and (d) reasonable attorneys' fees and costs.

111.    Because Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiffs' federally protected rights, Plaintiffs are entitled to an award of punitive damages against each Defendant under 42 U.S.C. § 3613(c)(1).

112.    Plaintiffs have no adequate remedy at law for the threatened removal of the fence, which would expose Mr. Gasaway to a risk of death or serious bodily injury and effectively deprive Plaintiffs of the safe use of their home; injunctive and declaratory relief are therefore necessary and appropriate under 42 U.S.C. §§ 3613(c) and 28 U.S.C. §§ 2201–2202.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, jointly and severally, and award the following relief:

a. A declaration, pursuant to 28 U.S.C. §§ 2201–2202 and 42 U.S.C. § 3613(c), that Plaintiffs' fence and associated landscaping constitute a reasonable accommodation and reasonable modification under the Fair Housing Act, and that Defendants' conduct alleged herein violated 42 U.S.C. §§ 3604(f)(2), 3604(f)(3)(A), 3604(f)(3)(B), and 3617;

b. A permanent injunction: (i) enjoining Defendants, their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from requiring, demanding, or seeking the removal, alteration, or destruction of Plaintiffs' fence; (ii) enjoining Defendants from prosecuting or threatening any enforcement action, fine, suspension, or lien predicated on the existence of the fence or its associated landscaping; (iii) directing Defendants to issue written confirmation of the approval of the fence as installed and to permit Plaintiffs to install and maintain reasonable screening landscaping; and (iv) enjoining Defendants from further discrimination, coercion, intimidation, threats, or interference against Plaintiffs on the basis of disability;

c. An award of compensatory damages to each Plaintiff in an amount to be determined by the jury, including damages for emotional distress, anxiety, humiliation, embarrassment, inconvenience, loss of use and enjoyment of their dwelling, aggravation of Mr. Gasaway's medical condition, and all economic losses proximately caused by Defendants' conduct;

d.  An award of punitive damages against each Defendant pursuant to 42 U.S.C. § 3613(c)(1);

e.  An award of Plaintiffs' reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2);

f.  Pre-judgment and post-judgment interest as allowed by law; and

g.  Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and 42 U.S.C. § 3613, Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted this July 22, 2026.

By: */s/ J. Courtney Cunningham*
Juan Courtney Cunningham, Esq.
FBN: 628166
**J. COURTNEY CUNNINGHAM, PLLC**
8950 SW 74th Court, Suite 2201
Miami, Florida 33156
T: 305-351-2014
cc@cunninghampllc.com
legal@cunninghampllc.com

*Counsel for Plaintiffs*